Citation Nr: 1714081 
Decision Date: 04/28/17 Archive Date: 05/05/17

DOCKET NO. 10-29 918 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office (RO)
in San Juan, the Commonwealth of Puerto Rico


THE ISSUES

1. Entitlement to a rating in excess of 10 percent for discoid lupus erythematosus (DLE). 

2. Entitlement to service connection for an acquired psychiatric disorder. 


REPRESENTATION

Veteran represented by: Florida Department of Veterans Affairs


ATTORNEY FOR THE BOARD

J.A. Flynn, Counsel



INTRODUCTION

The Veteran served on active duty from August 1984 to June 1987.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from two rating decisions of the VA RO. A November 2008 rating decision continued the 10 percent rating of the Veteran's DLE. A May 2010 rating decision declined to reopen the Veteran's claim of entitlement to service connection for an acquired psychiatric disorder. 

This appeal has previously been before the Board, most recently in May 2016, when it remanded the Veteran's claims in order to obtain medical treatment records and to provide the Veteran with a VA examination. As is discussed in greater detail below, with respect to the Veteran's claim of entitlement to an increased rating for DLE, the Board finds that its remand instructions have been substantially complied with, and the Board will proceed in adjudicating the Veteran's claim. See Stegall v. West, 11 Vet. App. 268, 271 (1998) (noting that when the remand orders of the Board are not complied with, the Board errs as a matter of law when it fails to ensure compliance); see also D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999).

The issue of entitlement to service connection for an acquired psychiatric disorder is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDING OF FACT

The Veteran's DLE involves a total body surface area and exposed area of less than five percent, and it results in a rash affecting the face and ears that does not produce any characteristics of disfigurement; the Veteran's DLE is not otherwise symptomatic, does not cause functional loss, and does not require systemic therapy.


CONCLUSION OF LAW

The criteria for a rating in excess of 10 percent for DLE have not been met. 38 U.S.C.A. § 1155, 5107 (West 2014); 38 C.F.R. §§ 3.321, 4.1, 4.3, 4.7, 4.118, Diagnostic Codes 7801-7806, 7809 (2008).


REASONS AND BASES FOR FINDING AND CONCLUSION

Duties to Notify and Assist

VA has certain notice and assistance obligations to claimants. 38 U.S.C.A. §§ 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2016). In the instant case, the Veteran was provided with all appropriate notification regarding his claim of entitlement to an increased rating in September 2008. The Veteran has not otherwise alleged or demonstrated any prejudice with regard to the content or timing of VA's notices or other development. See Shinseki v. Sanders, 129 U.S. 1696 (2009). Thus, adjudication of his claims at this time is warranted.

As to VA's duty to assist, the Board finds that all necessary development has been accomplished, and therefore appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993). The Veteran's post-service medical treatment records, including VA treatment records, private treatment records, and records from the Social Security Administration have been obtained, to the extent they were both identified and available. 

The duty to assist also includes, when appropriate, the duty to conduct a thorough and contemporaneous examination of the veteran. Green v. Derwinski, 1 Vet. App. 121 (1991). More specifically, a VA examination must be conducted when the evidence of record does not reflect the current state of the Veteran's disability. Schafrath v. Derwinski, 1 Vet. App. 589 (1991); 38 C.F.R. § 3.327(a) (2016). To that end, when VA undertakes to provide a VA examination, it must ensure that the examination is adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). 

In this case, the Veteran was provided with examinations addressing his DLE in May 2008, September 2009, and June 2016. The examination reports indicate that the examiners reviewed the Veteran's claims file and past medical history, recorded his current complaints, conducted appropriate evaluations, and rendered appropriate diagnoses and opinions consistent with the remainder of the evidence of record. The Board, therefore, concludes that these examination reports are adequate for the purpose of rendering a decision in the instant appeal. 38 C.F.R. § 4.2 (2016); see also Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). 

The Veteran declined the opportunity to participate in a hearing before the Board. The Board finds that there is no indication that any additional evidence relevant to the issues to be decided herein is available and not part of the claims file. Mayfield v. Nicholson, 499 F.3d 1317 (Fed. Cir. 2007). Thus, the duties to notify and assist have been met, and the Board will proceed to a decision.

Increased Rating

Disability ratings are determined by applying a schedule of ratings that is based on average impairment of earning capacity. Separate diagnostic codes identify the various disabilities. 38 U.S.C.A. § 1155; 38 C.F.R., Part 4. Each disability must be viewed in relation to its history and the limitation of activity imposed by the disabling condition should be emphasized. 38 C.F.R. § 4.1. Examination reports are to be interpreted in light of the whole recorded history, and each disability must be considered from the point of view of the appellant working or seeking work. 38 C.F.R. § 4.2. Where there is a question as to which of two disability evaluations shall be applied, the higher evaluation is to be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating is to be assigned. 38 C.F.R. § 4.7. 

In general, when an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. Francisco v. Brown, 7 Vet. App. 55, 58 (1994). When the appeal arises from an initial assigned rating, consideration must be given to whether staged ratings should be assigned to reflect entitlement to a higher rating at any point during the pendency of the claim. Fenderson v. West, 12 Vet. App. 119 (1999). However, staged ratings are also appropriate in any increased rating claim in which distinct time periods with different ratable symptoms can be identified. Hart v. Mansfield, 21 Vet. App. 505 (2007). In this case, staged ratings have been assigned, and as discussed below, the evidence does not support the assignment of any additional staged rating periods. 

The assignment of a particular diagnostic code is "completely dependent on the facts of a particular case." Butts v. Brown, 5 Vet. App. 532, 538 (1993). One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, diagnosis, and demonstrated symptomatology. Any change in diagnostic code by a VA adjudicator must be specifically explained. Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992).

Separate disabilities arising from a single disease entity are to be rated separately. 38 C.F.R. § 4.25 (2016); see also Esteban v. Brown, 6 Vet. App. 259, 261 (1994). Pyramiding-the evaluation of the same manifestation of a disability under different diagnostic codes-is to be avoided when rating a veteran's service-connected disabilities. 38 C.F.R. § 4.14 (2016).

As an initial matter, the Board notes that the Veteran's DLE has been evaluated as 10 percent disabling under Diagnostic Code 7800, applicable to disfigurement of the head, face, or neck. 38 C.F.R. § 4.118 (2016). The Board notes that the Veteran is otherwise in receipt of service connection for dyshidrosis erythema, which has been evaluated under Diagnostic Code 7806, applicable to dermatitis or eczema. While the issue of entitlement to a greater rating for DLE is on appeal, the issue of entitlement to an increased evaluation for dyshidrosis erythema, which the medical evidence indicates is not related to the Veteran's DLE, is not. The Board will thus carefully examine the record to determine the symptoms that the Veteran experiences specifically as a result of his DLE, while not addressing those symptoms that the Veteran experiences as a result of his dyshidrosis erythema.

Turning to the facts in this case, by way of history, prescription records, for example from February 1999, May 1999, December 1999, and February 2003, indicate that the Veteran was prescribed betamethasone cream in treatment of the dermatological disability affecting his hands. Consistent with this notation, in May 2007, a physician indicated that the Veteran had used systemic and topical steroids in treatment of his chronic dyshidrotic dermatitis. The physician indicated that the Veteran used systemic steroids only when the Veteran's chronic dyshidrotic dermatitis of the hands was active. 

In May 2008, an examiner found no active lesions associated with DLE, but instead found six or seven hyperpigmented lesions in the frontal area, and one in the left preauricular area. The examiner noted that the Veteran had constantly used a systemic corticosteroid, betamethasone 0.05% cream, over the past 12 months in treatment of his disability. The examiner found that the Veteran's DLE involved both a total body area and total exposed area of less than five percent of the Veteran's body. The Veteran's DLE was controlled with medication and avoiding sunlight exposure. 

The Veteran filed his claim of entitlement to an increased rating for DLE in August 2008. In November 2008, a clinician noted that the Veteran had no skin rashes, discoloration, lesions, or dryness. It was noted that the Veteran had DLE, but he had negative testing for antinuclear antibodies (ANA). In April 2009, a clinician noted that the Veteran had no skin rashes, discoloration, lesions, or dryness. In September 2009, a dermatologist noted that the Veteran had no active lesions on his head or neck associated with DLE. The Veteran reported experiencing an occasional butterfly rash with sun exposure, and he was counseled regarding sun protection and avoidance. 

The Veteran underwent a VA examination in September 2009, at which time the examiner noted that a 1991 biopsy confirmed a diagnosis of DLE. The Veteran's DLE had not been active, except that a reddish discoloration appeared on the Veteran's malar area following sun exposure. The Veteran was otherwise found not to have other skin or systemic symptoms. The Veteran had not received corticosteroid or immunosuppressive treatment for his DLE. The examiner diagnosed the Veteran with inactive DLE, which resulted in a patch of atrophic skin on the malar area and the bridge of the Veteran's nose, which involved both a total body area and total exposed area of less than five percent of the Veteran's body. The examiner noted that the Veteran's DLE did not affect his activities of daily living.

In November 2009, a dermatologist noted that the Veteran had no active lesions as a result of DLE, but the Veteran was ordered to start taking Plaquenil, an antirheumatic medicine, in treatment of his photosensitivity. In March 2010 and April 2010, clinicians noted that the Veteran had no skin rashes, discoloration, lesions, or dryness. In June 2010, the Veteran presented with multiple Methicillin-resistant Staphylococcus aureus (MRSA) abscesses. The Veteran reported a history of intermittent hematuria and rectal bleeding, and he reported experiencing fever, chills, general malaise, and sore throat immediately before his admission. The Veteran experienced a significant platelet drop while receiving treatment, which was characterized as severe thrombocytopenia. It was suspected that the Veteran had a viral infection. 

In a July 2010 rheumatology consultation, it was noted that there was no evidence of active DLE. The Veteran indicated that he had a long history of on-and-off polyarthralgias, fatigue, facial rash, oral ulcers, skin abscess, and mild-to-moderate photosensitivity. The clinician noted that the Veteran had generalized maculopapular lesions of different stages, without facial macular or discoid rash. The Veteran was found to be alert, oriented, in no acute distress, and with stable vital signs. There was no evidence of photosensitivity rash, oral ulcers, tender joints, or synovitis. The clinician found that there was no clear evidence of systemic lupus erythematosus (SLE) and no definitive criteria to suspect active systemic involvement. No treatment was indicated. 

In July 2010, a rheumatologist noted that the Veteran had not shown active DLE lesions. The rheumatologist noted that the Veteran had experienced recurrent MRSA skin infections and abscesses, but such conditions were multifactorial in origin and were not related to any lupus-specific skin conditions. The clinician noted that the Veteran did not have evidence of active inflammatory arthritis or other end organ damage that would be consistent with a diagnosis of SLE. Immunomodulatory therapy was not indicated, and the clinician noted that the use of such treatment could worsen the Veteran's skin complaints. The clinician noted that the Veteran's recent thrombocytopenia occurred in relation to intravenous antibiotic therapy and had resolved. The Veteran's laboratory findings were very limited, and no inflammatory markers were available beyond those that likely reflected the Veteran's recent skin infection. The clinician noted that all of the Veteran's ANA testing had been negative, except for a test from September 2004 that was borderline positive. An anti-dsDNA antibody test was additionally negative. The clinician noted that these negative serologies would be very unusual in a case that involved SLE. 

In July 2014, it was noted that the Veteran had no recent lesions associated with DLE. In September 2014, following blood testing, a rheumatologist informed the Veteran, in pertinent part, that lupus was not causing his body aches. 

In April 2015, the Veteran reported that he had experienced a significant malar rash with sun exposure. In May 2015, a clinician noted that the Veteran had been seen by rheumatology, which had determined that the Veteran did not have SLE. In November 2015, a dermatologist stated that the Veteran's DLE had been treated with steroid creams, but no oral medications. The dermatologist indicated that the Veteran's history of DLE was likely a misdiagnosis, because the Veteran did not suffer from any symptoms concerning for DLE or SLE, and the condition had been ruled out at several previous rheumatology appointments. 

In March 2016, it was noted that the Veteran had a history of DLE, but the clinician questioned whether this was a true diagnosis, because laboratory workups since that time had been negative. The Veteran was otherwise treated for severe thrombocytopenia, which a clinician noted could represent microangiopathic hemolytic anemia associated with the Veteran's cocaine use, SLE, or vasculitis. thrombotic thrombocytopenic purpura (TTP) could not be excluded. In May 2016, the Veteran was asymptomatic. It was noted that the Veteran had been admitted with severe thrombocytopenia and evidence of microangiopathy consistent with TTP. A toxicology screen was positive for cocaine. The Veteran received four weekly administrations of low-dose Rituximab in treatment of this condition. 

In May 2016, the Veteran submitted a Disability Benefits Questionnaire from a private physician, who noted that the Veteran had DLE that resulted in TTP. The physician indicated that the Veteran took up to 60mg of oral corticosteroids daily in treatment of his condition, and he took other immunosuppressive medications in the form of multiple plasma exchanges and intravenous Rituximab. The physician indicated that the Veteran's disease was acute and likely needed long-term treatment. The episode of TTP was a possible exacerbation of the Veteran's autoimmune condition, and the Veteran experienced about one exacerbation annually lasting for a week or more. The Veteran's autoimmune disease resulted in severe low platelets and the risk for spontaneous bleeding. The physician indicated that the Veteran had leukopenia and thrombocytopenia as a result of his DLE. The Veteran had bilateral hidradenitis suppurativa and thrombocytopenia as a result of his DLE. The physician noted that the Veteran experienced flare-ups of DLE that required regular clinical monitoring. During some flare-ups, the Veteran had low platelets, which required hospitalization, and he could not work during these times. The physician noted that that Veteran's diagnosis was DLE without systemic involvement. The Veteran's prognosis and treatment would be guided by hematology for TTP. 

In May 2016, a VA clinician noted that the Veteran had a history of DLE, and who was admitted for nausea, vomiting, and hematuria. The Veteran was treated with plasma exchange, steroids, and Rituximab. The Veteran's platelets responded, and the Veteran was doing well. The Veteran had no major complaints, and he denied bleeding, bruising, and hematuria. The Veteran had no new rashes, headaches, confusion, or oral ulcers. The Veteran complained of diffuse muscle pain. The Veteran was found to have DLE without active discoid lesions or evidence of systemic lupus. The Veteran had multiple negative ANA, two positive SSA, and no nephritis or serositis. The Veteran had a past episode of thrombocytopenia that was attributed to intravenous antibiotic use for a skin infection. The Veteran's thrombocytopenia responded to steroids. It was noted that the Veteran had multiple small brown macules on his body with some hypo/hyperpigmentation on the ears. The Veteran had no active discoid lesions, follicular plugging, or scars. The Veteran had presented with acute thrombocytopenia that had responded well to aggressive TTP therapy with steroids, plasma exchange, and Rituximab. The clinician found that there was no evidence of SLE or active discoid disease and no indication for immunosuppression. 

In May 2016, a VA rheumatologist noted that the Veteran had biopsy-proven DLE since at least 2005. The Veteran's DLE had not involved the internal organs, and serological testing had been repeatedly negative for ANA, including during a recent episode of TTP. The examiner noted that the Veteran had small areas of alternating hyper- and hypopigmented macules in his outer ears, without evidence of active inflammation. The Veteran had no synovitis or typical lupus rashes. The Veteran's TTP was stable following high-dose steroids, four-times weekly Rituximab doses, and plasma exchanges. The rheumatologist indicated that the evidence from the last ten years indicated that the Veteran had DLE without systemic involvement, noting that consistently negative ANA testing provided strong evidence against systemic involvement. The Veteran had a previously-positive SSA, but no other serological markers of primary Sjogren's syndrome. The examiner indicated that he could not diagnose the Veteran with a primary systemic rheumatological condition. The Veteran's discoid lesions were healed and did not require active treatment. 

In June 2016, a VA examiner noted that the Veteran had a medical history involving multiple skin issues, including DLE, TTP, dyshidrotic eczema, hidradenitis suppurativa, and prurigo nodularis. The Veteran reported that his DLE typically affected his face, ears, and arms. The Veteran experienced a skin rash with mild itchiness that lasted for several weeks and resolved. The Veteran reported experiencing an occasional butterfly rash with sun exposure. The examiner noted that the Veteran's disability did not cause scarring or disfigurement of the head, face, or neck. The Veteran did not have any skin neoplasms, and he did not have any systemic manifestations due to skin disease. The Veteran had not been treated with oral or topical medications in the past 12 months, nor had he had any other treatments or procedures in the past 12 months for exfoliative dermatitis or papulosquamous disorders. The Veteran had not had any debilitating or non-debilitating episodes in the past 12 months due to urticarial, primary cutaneous vasculitis, erythema multiforme, or toxic epidermal necrolysis. The examiner noted that the Veteran experienced minimal redness without a rash on the bridge of nose and cheek area, which involved both a total body area and total exposed area of less than five percent of the Veteran's body. The condition did not affect the Veteran's ability to work. The examiner opined that the Veteran had no symptoms related to his DLE other than minimal redness on the face. 

Turning to an evaluation of these facts, the Board will first discuss which symptoms are attributable to the Veteran's DLE, and which symptoms are not. While the evidence shows that the Veteran has experienced episodes involving hematological symptoms such as thrombocytopenia and TTP, the weight of the evidence is against a finding that such episodes are related to the Veteran's DLE. A July 2010 rheumatologist found that the Veteran's June 2010 MRSA skin infections and abscesses were not likely related to the Veteran's DLE, nor, the rheumatologist found, did the medical evidence otherwise support a finding of systemic manifestations of lupus. Similarly, following the Veteran's 2016 treatment for thrombocytopenia and TTP, in May 2016 and June 2016, VA rheumatologists and examiners were unable to find that the Veteran's DLE had resulted in any systemic symptoms. 

With that said, the Board acknowledges that in May 2016, a private physician associated the Veteran's TTP and thrombocytopenia with his DLE. The Board notes, however, that the physician opined only that the Veteran's TTP was a "a possible exacerbation" of the Veteran's DLE. The Board places relatively less probative weight on this opinion than on the contrary opinions of the May 2016 and June 2016 clinicians because the physician did not consider the laboratory results that, according to such clinicians, have consistently showed that the Veteran's DLE did not manifesting systemic symptoms. Furthermore, the physician's use of ambiguous language such as "possible" detracts from the probative value of the opinion. The physician also indicated that the Veteran's DLE was not systemic, which is contrary to the physician's statement that the Veteran's DLE had resulted in hematological symptoms. In sum, the Board thus finds that the weight of the evidence is against a finding that the Veteran's DLE has resulted in symptoms such as thrombocytopenia and TTP.

With that said, the Board finds that clinicians have consistently found that the Veteran has not suffered from active DLE at any time since his August 2008 claim, for example in May 2008, November 2008, April 2009, September 2009, November 2009, March 2010, April 2010, July 2010, July 2014, November 2015, March 2016, May 2016, and June 2016. To the extent that clinicians have described symptoms of the Veteran's DLE, such symptoms have included only hyperpigmented papules and "minimal redness on the face". 

Turning to the appropriate Diagnostic Code for the Veteran's DLE, the Board notes that DLE is to be rated as disfigurement of the head, face, or neck (Diagnostic Code 7800), scars (Diagnostic Codes 7801-05), or dermatitis (Diagnostic Code 7806), depending on the predominant disability. These ratings are not to be combined with a rating for systemic lupus erythematosus (Diagnostic Code 6350). 38 C.F.R. § 4.118, Diagnostic Code 7809. 

In this case, the Board notes that Diagnostic Codes 7801-05 do not apply because these codes concern scarring other than facial scarring, which is the Veteran's primary symptom of DLE. Diagnostic Code 6350 does not apply because the Veteran's DLE has consistently been found not to result in systemic manifestations. With these Diagnostic Codes excluded, the Board will determine whether the Veteran is entitled to a rating in excess of the currently-assigned 10 percent evaluation under Diagnostic Code 7800, applicable to disfigurement of the head, face, or neck. 38 C.F.R. § 4.118. The Board will also consider whether the Veteran's DLE warrants an evaluation under Diagnostic Code 7806, applicable to dermatitis.

Since the Veteran's August 2008 claim, the applicable rating criteria for skin disorders, found at 38 C.F.R. § 4.118, was amended effective October 23, 2008. 73 Fed. Reg. 54,708 (Sept. 23, 2008). This amendment is to be applied to pending claims only when specifically requested by the Veteran, which does not appear to have been done in this case.

Diagnostic Code 7800 provides for the following ratings:

 10 percent: With one characteristic of disfigurement. 
30 percent: Visible or palpable tissue loss and either gross distortion or asymmetry of one feature or paired set of features (nose, chin, forehead, eyes (including eyelids), ears (auricles), cheeks, lips); or with two or three characteristics of disfigurement. 
50 percent: Visible or palpable tissue loss and either gross distortion or asymmetry of two features or paired sets of features (nose, chin, forehead, eyes (including eyelids), ears (auricles), cheeks, lips); or with four or five characteristics of disfigurement.
80 percent: Visible or palpable tissue loss and either gross distortion or asymmetry of three or more features or paired sets of features (nose, chin, forehead, eyes (including eyelids), ears (auricles), cheeks, lips), or; with six or more characteristics of disfigurement.

The eight characteristics of disfigurement are as follows: (1) Scar 5 or more inches (13 or more cm.) in length; (2) Scar at least one-quarter inch (0.6 cm.) wide at its widest part; (3) Surface contour of scar elevated or depressed on palpation; (4) Scar adherent to underlying tissue; (5) Skin hypo- or hyperpigmented in an area exceeding 6 square inches (39 sq. cm.); (6) Skin texture abnormal (irregular, atrophic, shiny, scaly, etc.) in an area exceeding 6 square inches (39 sq. cm.); (7) Underlying soft tissue missing in an area exceeding 6 square inches (39 sq. cm.); and (8) Skin indurated and inflexible in an area exceeding 6 square inches (39 sq. cm.). 38 C.F.R. § 4.118, Diagnostic Code 7800, Note 1.

In this case, the Veteran's DLE has not resulted in visible or palpable tissue loss and either gross distortion or asymmetry of one feature or paired set of features. With respect to the characteristics of disfigurement, the Veteran's DLE has not produced a scar at least 5 inches long or one-quarter inch wide. The Veteran's DLE has not resulted in a scarring that is elevated, depressed, or adherent. The Veteran's DLE has not resulted in missing underlying soft tissue, nor has it resulted in skin that is indurated and inflexible. 

While clinicians have noted that the Veteran's DLE resulted in a "patch of atrophic skin on the malar area and the bridge of the Veteran's nose," it has not been shown that the size of this atrophic patch exceeds six square inches. Similarly, while clinicians have noted hyperpigmented lesions on the Veteran's ears, the evidence does not suggest that the size of such lesions exceeds six square inches. Indeed, the June 2016 examiner specifically found that the Veteran's DLE was not disfiguring. Thus, the Board finds that the Veteran's DLE does not manifest at least two characteristics of disfigurement, and a rating in excess of 10 percent under Diagnostic Code 7800 is unavailable to the Veteran. 

Turning now to Diagnostic Code 7806, which is applicable to dermatitis or eczema, the following ratings apply, in pertinent part: a 30 percent rating applies when 20 to 40 percent of the entire body or the exposed areas is affected, or; when systemic therapy such as corticosteroids or other immunosuppressive drugs is required for a total duration of 6 weeks or more, but not constantly, during a 12-month period. A 60 percent rating applies when more than 40 percent of the entire body or the exposed areas is affected, or; when constant or near-constant systemic therapy such as corticosteroids or other immunosuppressive drugs is required during a 12-month period.

In this case, DLE has not produced symptoms affecting 20 percent or more of the Veteran's entire body or exposed areas. Indeed, the May 2008, September 2009, and June 2016 examiners found that the Veteran's DLE affected less than 5 percent of the Veteran's entire body area or exposed body area. A greater rating under Diagnostic Code 7806 is unwarranted based on the area of the Veteran's body affected by DLE. 

With regard to the therapies that have been employed to treat the Veteran's DLE, a rating in excess of 10 percent is available to the Veteran if his DLE has required systemic therapy such as corticosteroids or other immunosuppressive drugs for at least 6 weeks during any 12-month period. The Board finds that the weight of the evidence is against a finding that the Veteran has received such therapies in treatment of his DLE. In September 2009, an examiner noted that the Veteran had not received corticosteroid or immunosuppressive treatment for his DLE. In July 2010, rheumatologists found that no treatment, including immunomodulatory therapy, was indicated for the Veteran's DLE. Indeed, a July 2010 rheumatologist opined that such therapy could worsen the Veteran's dermatological complaints. In May 2016, a VA clinician found that the Veteran had no evidence of active DLE, and there was no indication for immunosuppression. In May 2016, a VA rheumatologist found that the Veteran had no evidence of active DLE, and there was no need for active treatment. In June 2016, a VA examiner indicated that the Veteran had not been treated with oral or topical medications in the past 12 months.

While the Board finds that the weight of the evidence fails to support a finding that the Veteran's DLE has resulted in systemic symptoms requiring systemic therapy for at least 6 weeks during any 12-month period, it acknowledges that the record contains some notations arguably supporting such a finding. Upon close review of the medical record, however, the Board places relatively little weight on these notations. For example, while the May 2008 examiner indicated that the Veteran's DLE had required a constant systemic corticosteroid-betamethasone 0.05% cream-over the past 12 months, the Board finds that the weight of the evidence, including a May 2007 statement from the Veteran's physician, supports a finding that the Veteran received systemic steroid therapy only when the Veteran's chronic dyshidrotic dermatitis of the hands, rather than his DLE, was active. The weight of the medical record, including prescription records, otherwise supports a finding that the Veteran was prescribed betamethasone cream in treatment of his chronic dyshidrotic dermatitis of the hands, rather than his DLE. The Board thus affords the May 2008 examiner's statement regarding the treatment of DLE with systemic therapy with relatively little weight. 

Similarly, while the record shows that the Veteran has undergone systemic steroid therapy since his August 2008 claim, such treatment occurred in July 2010, in response to the Veteran's MRSA skin infections, and in 2016, in treatment of his TTP. As discussed in greater detail above, the Board has found that the weight of the medical evidence of record is against a finding that these episodes, or the corticosteroids prescribed in treatment of these episodes, occurred as a result of the Veteran's DLE. Without systemic therapy occurring for at least 6 weeks during any 12-month period, the Board finds that a rating in excess of the Veteran's existing 10 percent rating is unwarranted under Diagnostic Code 7806. 

In sum, the Board finds that the preponderance of the evidence is against the assignment of a schedular rating in excess of 10 percent at any time. 38 U.S.C.A. § 5107(b) (West 2014); Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

Extraschedular Considerations

The Board has considered whether the Veteran is entitled to a greater level of compensation on an extraschedular basis. Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors that render application of the schedule impractical. 38 C.F.R. § 3.321(b) (2016); Fisher v. Principi, 4 Vet. App. 57 (1993).

To determine whether to refer a claim for consideration of assignment of an extraschedular rating, first, the Board must determine whether the evidence presents such an exceptional disability picture that the schedular ratings for that service-connected disability are inadequate. Second, if the schedular rating does not contemplate the Veteran's level of disability and symptomatology and is found to be inadequate, the Board must determine whether the Veteran's disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a veteran's disability picture and that picture has attendant thereto related factors such as marked interference with his employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extra-schedular rating. 38 C.F.R. § 3.321(b) (2016); Thun v. Peake, 22 Vet. App. 111 (2008). 

The Board finds that the rating criteria are not inadequate, and it does not appear that the Veteran had exceptional or unusual symptomatology associated with his DLE. The weight of the medical evidence of record indicates that the Veteran's primary symptom of DLE is a facial rash, which is contemplated by the relevant rating criteria. The Veteran does not have any symptoms from his service-connected DLE that are unusual or are different from those contemplated by the schedular rating criteria. Therefore, the available schedular evaluations are adequate. The Board finds that referral for extraschedular consideration is not warranted.

The Board has also considered whether an inferred claim for a total disability rating based on individual unemployability (TDIU) under Rice v. Shinseki, 22 Vet. App. 447 (2009) has been raised. In this case, the Board denied the Veteran's claim for a TDIU in August 2010, and the Veteran did not appeal this determination. He has not since raised the matter again. Therefore, the Board finds that a claim for TDIU is not raised by the record.


ORDER

A rating in excess of 10 percent for DLE is denied.


REMAND

When the Board's remand orders are not complied with, the Board errs as a matter of law when it fails to ensure compliance. See Stegall v. West, 11 Vet. App. 268, 271 (1998). In May 2016, the Board remanded the Veteran's claim of entitlement to service connection for an acquired psychiatric disability, in part, to provide the Veteran with an evaluation of the etiology of the Veteran's disability. In July 2016, an examiner answered none of the Board's questions, stating that such questions could not be answered without resort to speculation. Given the voluminous medical evidence of record, it is unclear to the Board why the examiner was unable to provide the requested opinions. Accordingly, the AOJ should again attempt to obtain the requested opinions from an examiner who has not yet evaluated the Veteran. 

Accordingly, the case is REMANDED for the following actions:

1. Obtain the requested psychiatric opinion from a VA examiner who has not previously examined the Veteran. To the extent that the examiner determines that an in-person examination of the Veteran is warranted, such an examination should be performed. Otherwise, after reviewing the Veteran's claims file, the examiner should:

a) Describe and diagnose the Veteran's acquired psychiatric disability.

b) Address whether it is at least as likely as not (that is, a 50 percent probability or greater) that the Veteran's acquired psychiatric disability began during or was otherwise caused by his military service. 

2. Then, readjudicate the issue of entitlement to service connection for an acquired psychiatric disorder. If the claim remains denied, provide the Veteran with a supplemental statement of the case and allow an appropriate time for response. 

The Veteran has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or by the Court for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




____________________________________________
THOMAS H. O'SHAY
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs